**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Clementine Thomas, | No. CV-20-08182-PCT-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| United States of America, et al., | |
| Defendants. | |

On August 31, 2017, Veronica Stevens ("Stevens")—a 75-year-old wheelchair-bound woman with an array of serious health conditions, including blindness, end-stage renal disease, diabetes, cirrhosis, and an amputated leg—fell out of her wheelchair while being driven in a medical transportation van to a dialysis appointment. Stevens fell because the van's driver, who is considered a federal employee for purposes of this lawsuit, declined to secure her seatbelt at the beginning of the trip at her request. The fall caused Stevens to suffer a fractured femur. In the days following the accident, Stevens began to experience other medical complications, including seizures. Finally, on September 9, 2017, Stevens died.

The key disputed issue in this action under the Federal Tort Claims Act ("FTCA"), which is brought by Plaintiff Clementine Thomas ("Plaintiff") on behalf of Stevens's seven surviving children, is whether the injuries Stevens sustained on August 31, 2017 were the proximate cause of her death less than two weeks later. The bench trial took place on September 12-13, 2022. The Court now issues its findings of fact and conclusions of law.

**LEGAL STANDARD**

Rule 52(a)(1) of the Federal Rules of Civil Procedure provides that "[i]n an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court."

The Ninth Circuit has explained that a district court's findings under Rule 52(a) "should be explicit enough to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the ground on which the trial court reached its decision." *Alpha Distrib. Co. of Cal., Inc. v. Jack Daniel Distillery*, 454 F.2d 442, 453 (9th Cir. 1972).  With that said, such findings must also "strike an appropriate balance between detail, simplicity, and efficiency. . . .  [E]xcessively long and detailed findings are not necessary . . . and can even be unhelpful. . . .  Ultimately, the trial court's findings should be sufficient to reveal the court's concept of the facts and applicable legal standards without being needlessly elaborate or too wordy." *See* 2 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 52, at 46-47 (2021).  Put another way, "the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts." *See* Fed. R. Civ. P. 52, advisory committee's note to 1946 amendment.

**FINDINGS OF FACT**

I.  The Accident

At the time of the relevant events in this case, Stevens was a resident of Whiteriver, Arizona who was 75 years old and had an array of serious preexisting medical conditions, including diabetes, hypertension, coronary artery disease (with coronary artery bypass surgery), renal failure requiring dialysis, end-stage renal disease, osteoporosis, cirrhosis, hypothyroidism, and an amputated right leg. (Doc. 54 at 3; Trial Ex. 3 at 28; Trial Ex. 8 at 26.)  Stevens was also blind and wheelchair-bound. (*Id.*)

On August 31, 2017, Stevens had an appointment at a dialysis clinic in Show Low,

Arizona. (Doc. 54 at 3.) Stevens's usual mode of transportation to her dialysis appointments was to obtain a ride from White Mountain Apache Tribe Patient Transportation Services, which provided medical transportation services pursuant to a so-called 638 contract with the United States. (*Id.*) Stevens's usual driver, and the driver on August 31, 2017, was Denny Parker ("Parker"), who is deemed a federal employee for FTCA purposes. (*Id.*)

When Parker helped Stevens get into the van on August 31, 2017, he "strapped the wheelchair" to the ground to make sure the wheelchair was stationary. (Parker Deposition, pages 34, 37-38.) However, Parker did not secure Stevens's shoulder belt. (Doc. 54 at 3.)

On the one hand, Parker bears much of the responsibility for the failure to secure Stevens's shoulder belt. This failure "violated a safety procedure of the White Mountain Patient Transportation Service." (*Id.*) Additionally, Parker had been instructed during his training that "it's very important to make sure [passengers are] secure in the wheelchair so that they don't come out." (Parker Deposition, page 49.) Parker was ultimately disciplined and demoted by his employer for failing to secure Stevens's shoulder belt. (*Id.* at 50.) Parker also signed a statement following his shift in which he offered "full apologies" and took "any responsibilities with this incident." (Trial Ex. 13.)

On the other hand, Stevens also bears some of the responsibility for her failure to wear a shoulder belt on August 31, 2017. Parker testified during his deposition, and the Court accepts as true, that although he once followed a practice of securing Stevens's shoulder belt during trips to the dialysis clinic, he stopped doing so after Stevens said that "[s]he didn't like it" because it "hurt her neck." (Parker Deposition, page 37.) Given this testimony, and in light of the other testimony at trial that Stevens was a strong-willed woman, the Court finds that Stevens was not properly belted during the trip to the dialysis clinic on August 31, 2017 in part because she insisted on not being belted. Although the Court accepts (as Plaintiff's expert West testified) that Parker should not have acceded to Stevens's wishes on this point, and instead should have refused to transport her unless she agreed to be belted, this does not change the fact that Stevens is partially at fault.

While en route to the dialysis clinic, Parker applied his brakes at a yellow light. (Doc. 54 at 3.) Having considered the witness testimony and statements in the medical records concerning this aspect of the incident, the Court agrees with Plaintiff that Parker's manner of driving was itself negligent, separate and apart from his earlier failure to secure Stevens's shoulder belt. (*See, e.g.*, Trial Ex. 3 at 28 ["Patient states that she was in her transport van to the dialysis center when the van abruptly stopped . . . ."].)

The change in velocity arising from Parker's braking caused Stevens to fall out of her wheelchair and onto the floor of the van. (Doc. 54 at 3.) This fall, in turn, caused Stevens to "sustain[] a left distal femur fracture and a left distal tibia/fibular fracture." (*Id.*) However, Parker and Stevens did not initially realize that Stevens had suffered these fractures—when Parker asked Stevens how she felt, she replied that she was okay and didn't need to go to the hospital. (Parker Deposition, page 38.) As a result, Parker simply placed Stevens back in her wheelchair and then completed the trip to the dialysis center. (*Id.* at 38-39.)

Stevens did not receive dialysis upon arrival—instead, the clinic's employees arranged for her to be transported by emergency medical services ("EMS") personnel to the Summit Healthcare Regional Medical Center ("Summit Healthcare") in Show Low. (Trial Ex. 2, Bates TRIAL-EX-000008.)

The medical notes from Stevens's visit to Summit Healthcare on August 31, 2017 state that Stevens "denie[d] hitting [her] head" during the fall, denied having a "headache or blurred vision," and had the chief complaint of leg pain. (*Id.*, Bates TRIAL-EX-000004.) After x-rays revealed the existence of the leg fractures, the personnel at Summit Healthcare decided that Stevens should be transferred to Banner University Medical Center ("Banner") in Phoenix for further treatment, in part due to the complications arising from Stevens's need for dialysis. (*Id.*, Bates TRIAL-EX-000006.)

II.     The Initial Round Of Treatment At Banner

On August 31, 2017, Stevens arrived at Banner. (Trial Ex. 3 at 45.) The initial plan was to "[f]ollow up with ortho . . . and internal medicine recommendations." (*Id.* at 46.)

On September 1, 2017, Stevens met with more doctors at Banner. (*Id.* at 26.) The treatment notes from this date include notations that Stevens "does not ambulate" and "uses a wheelchair 100% of the time" and that the risk of "wound healing complications [was] very high" due in part to Stevens being "nonambulatory at baseline" and being "poorly diabetic on hemodialysis." (*Id.* at 26-27.) A doctor also noted that Stevens's lab work reflected high levels of blood urea nitrogen ("BUN") and creatinine. (*Id.* at 29.)[1]

That same day, Stevens was taken to the operating room at Banner for an "open reduction and internal fixation" surgical procedure on her fractured femur. (*Id.* at 40.)

Stevens was stable following the surgery and remained at Banner until September 3, 2017, when she was discharged to her home. (*Id.*) The discharge notes state: "On day of discharge, the patient is well pain controlled, tolerating renal diet, underwent hemodialysis." (*Id.*)

III.   The First Set Of Seizures

On the morning of September 4, 2017—the day after being discharged from Banner—Stevens "woke up normally" and was getting ready to have breakfast with her family "when she started seizing on the right side of the body [and] lost consciousness." (Trial Ex. 5, Bates TRIAL-EX-000087.) In response, Stevens's family called for EMS personnel to transport her to the emergency room in Whiteriver. (*Id.*) The medical notes from this visit reflect that Stevens "was still seizing when she arrived here" but later "regained full consciousness." (*Id.*) After resting at the medical facility for most of the day, Stevens was "discharged home" at around 6:50 pm. (*Id.*, Bates TRIAL-EX-000096.)

IV.   The Second Seizure

The next day, September 5, 2017, Stevens was at the dialysis clinic in Show Low when the clinic's employees witnessed her undergoing "multiple episodes of 'spacing out'" before she "passed out cold." (Trial Ex. 6, Bates TRIAL-EX-000105.) In response, the

---

[1] The record also contains evidence that on August 15, 2017, two weeks before the accident, Stevens's BUN was measured at 154 mg/dL and Stevens's creatinine was measured at 7.86 mg/dL. (Trial Ex. 2, Bates TRIAL-EX-000013.) Both experts acknowledged that these levels were "very high," and Dr. Hendin credibly explained that these levels were consistent with renal failure.

employees called 911. (*Id.*) EMS personnel took Stevens's vital signs and then brought her in an ambulance to Summit Healthcare. (*Id.*)

The treatment notes from Summit Healthcare state that Stevens's chief complaint was "single seizure" and provide the following narrative: "This occurred today. The patient recovered at the scene. Seizure was witnessed. Had a single isolated seizure. Seizure activity was brief. The patient lost consciousness." (Trial Ex. 7, Bates TRIAL-EX-000111.) As for the recommended course of treatment, the notes state: "Whiteriver records [from September 4, 2017] show a normal CT and generally unremarkable labs. Patient's labs today show a need for dialysis as her sodium is low and potassium high. CXR is concerning for pneumonia . . . . Given her new seizures and need for dialysis she will need transfer. I spoke with [a doctor] at Banner and he was willing to accept this patient for transfer." (*Id.*, Bates TRIAL-EX-000114.)

V.   The Second Round Of Treatment At Banner

On September 6, 2017, Stevens was readmitted to Banner. (Trial Ex. 8 at 1.) The initial consultation notes state that Stevens was "pretty debilitated" but was "stable without any witnessed seizures" the previous night. (*Id.* at 23-24.) The notes continue: "Etiology of seizures unknwon [sic], hyponatremia[2] could be the reason." (*Id.* at 28.)

Also on September 6, 2017, doctors at Banner performed an MRI on Stevens's brain. (*Id.* at 33.) The MRI revealed a "[t]hin right posterior subdural hematoma measuring 3 mm" but "[n]o midline shift or mass effect." (*Id.*) In an ensuing note, Dr. Capampangan opined that this subdural hematoma was one of the likely causes of Stevens's seizures: "Seizure likely induced from her electrolyte imbalances from her HD [hemodialysis] and her small SDH [subdural hematoma]." (*Id.* at 34.)

Because the subdural hematoma was the subject of significant discussion during trial, it is necessary to make additional findings concerning it. Dr. Capampangan wrote in one portion of his notes that the "[h]ematoma looks to be 1-2 weeks [old] and likely

---

[2]   Dr. Hendin testified that hyponatremia is a condition in which the level of sodium in the blood is too low.

occurred before breaking her leg." (*Id.*) This observation, if true, could be helpful to the defense on the question of causation, because it could suggest that Stevens's seizures and death were caused by an injury that predated her accident on August 31, 2017. However, in other portions of his notes, Dr. Capampangan used the phrase "Etiology from fall" when describing the subdural hematoma (*id.* at 36)—phraseology that suggests the hematoma *was* caused by the accident on August 31, 2017. Additionally, a CT scan that was performed on September 4, 2017 did not reveal the presence of a subdural hematoma. (*Id.* at 40.) Although not dispositive, this tends to suggest the hematoma was not an old injury that predated the accident. Unfortunately, because neither side called Dr. Capampangan as a witness at trial or disclosed that their respective experts would be opining on the cause of the subdural hematoma, the Court finds it impossible, in its capacity as finder of fact, to reach any definitive conclusions about the causal relationship between the accident and the subdural hematoma. But as further discussed elsewhere in this order, this uncertainty does not detract from the Court's ability to reach a conclusion on the issue of proximate causation.

Also on September 6, 2017, doctors at Banner performed an electroencephalography ("EEG") on Stevens's brain. (*Id.* at 45-46.) It showed that Stevens had "intermixed theta and alpha frequency rhythms with admixed delta waves." (*Id.* at 45.) Dr. Hendin testified at trial that these findings were consistent with "metabolic encephalopathy," which "means that rather . . . than a problem being focal to a part of the brain, it is diffusely abnormal."[3] However, during cross-examination, Plaintiff's counsel attempted to show that Dr. Hendin's opinions on this point were contradicted by the observation in Dr. Capampangan's notes that Stevens was suffering from a "[t]raumatic brain injury." (*Id.* at 36.) As with the dispute over the genesis of the subdural hematoma, the Court finds it impossible, in its capacity as finder of fact, to reach any definitive conclusions about whether the abnormal EEG readings were the result of trauma to the

---

[3] Because a final transcript of the bench trial is not yet available, quotations attributed to Drs. Fischione and Hendin are based on the rough version of the transcript that is available to the Court.

brain or unrelated metabolic problems that Stevens was experiencing—the Court's impression that this is a highly complicated medical question, yet it was addressed in only cursory fashion at trial. But as with the dispute over the subdural hematoma, any uncertainty over this specific factual point does not detract from the Court's ability to reach a conclusion on the issue of proximate causation.

On September 8, 2017, two days after her readmission, Stevens was discharged from Banner to return home. (*Id.* at 39.) The discharge notes include a notation that Stevens's hyponatremia had been "resolved." (*Id.* at 39-40.) The recommended course of treatment was simply to return for a follow-up orthopedic appointment on September 14, 2017 and to return for a follow-up neurology appointment in three months. (*Id.* at 40-41.)

VI.   Death

On the evening of September 9, 2017—the day after being discharged from Banner—Stevens was found "apneic and pulseless" in her home by one of her daughters. (Trial Ex. 5, Bates TRIAL-EX-000086.) The daughter did not perform CPR, because Stevens had previously indicated that she did not wish to be resuscitated, but called EMS for assistance. (*Id.*) Upon arrival, EMS personnel noted that Stevens had "[n]o signs of trauma" and was "initially PEA but soon became asystolic." (*Id.*) Stevens was pronounced dead at 8:16 pm. (*Id.*)

No autopsy was performed on Stevens following her death. In a death certificate signed on September 13, 2017, Dr. Rydberg (who, it appears, never personally treated Stevens) opined that Stevens's immediate cause of death was "New Onset Seizure Disorder" and stated that this cause of death was "due to or as a consequence of" the following two conditions: (1) "Subdural Hematoma And Or Hypernatremia"; and (2) "Left Leg Femur And Tibia/Fibula Fracture." (Trial Ex. 9.) Dr. Rydberg also characterized Stevens's "End Stage Renal Diseases On Hemodialysis" as an "other significant condition[] contributing to death but not resulting in the underlying causes given above." (*Id.*) Dr. Rydberg indicated that Stevens's "manner of death" was "Natural Death." (*Id.*)

…

VII. Expert Testimony Concerning Causation

At trial, each side presented an expert to opine on Stevens's cause of death. As an initial matter, both experts acknowledged that the conclusions expressed in the death certificate were internally inconsistent in various respects. The Court agrees and assigns little weight to the death certificate.

Plaintiff's expert, Dr. Fischione, is a forensic pathologist. His overarching opinion is that the cause of Stevens's death was "complications of blunt force trauma in the circumstances surrounding . . . what happened at the time that she was catapulted out of her wheelchair." Although Dr. Fischione acknowledged that Stevens already had an array of serious health conditions (*i.e.*, "co-morbidities") at the time of the accident, he identified various reasons why those conditions should not be considered the sole cause of her death. For example, Dr. Fischione stated that although Stevens had very high BUN and creatinine levels on August 15, 2017, blood work taken after the accident showed that those levels had normalized—and, thus, it would be illogical to conclude that they were the cause of death on September 9, 2017. More broadly, Dr. Fischione opined that when an elderly person with existing co-morbidities suffers a serious biomechanical injury, "the bigger issue [is] what trauma does to the body that already has extensive co-morbidities. That is the underlying issue leading to why Ms. Stevens passed away nine days after the accident." Dr. Fischione noted that "this is a very common scenario in elderly people who have fractures. Whether they are hip fractures due to falls, whether they are bone fractures, lower extremity fractures due to motor vehicle accidents or a case such as this. This is not surprising." During redirect, Dr. Fischione elaborated that when an elderly patient with co-morbidities sustains a fracture injury, "[b]ecause they are laying there static immobile day after day" as the injury heals, the patient "goes into what is called a negative balance, meaning that her cells are not acting in the normal function because of her stasis and immobility," and this negative balance can cause various fatal conditions, including "cardiac arrhythmia," pneumonia, and pulmonary emboli.

Defendant's expert, Dr. Hendin, is a neurologist. As an initial matter, Dr. Hendin

opined that Stevens's post-accident seizures were not caused by the accident, but instead were caused by "hyponatremia or metabolic" factors, and that Stevens's ultimate cause of death was not hyponatremia or seizures, but a heart attack. When asked whether he agreed with Dr. Fischione's opinion that Stevens "died as a result of complications from blunt force trauma with the trauma being her broken leg," Dr. Hendin explained that he disagreed because, although "I can certainly understand why a person would come to that conclusion" given that "[h]er death was a very short time after her fall" and "she sustained a very real orthopedic injury from her fall," "[s]adly, this is a woman who I think very courageously lived through a lot of co-morbidities. I think it was the co-morbidities that ultimately were the cause of her death, not the trauma." During cross-examination, Dr. Hendin conceded that it was "more than slightly possible" that the accident had contributed to Stevens's death but stated that this causal link "can't raise . . . to a level of probability." On redirect, Dr. Hendin clarified that he couldn't identify any specific co-morbidity that caused Stevens' heart attack because all of the co-morbidities worked together to cause it: "She had cardiovascular disease, MIs [myocardial infarctions], heart attacks, . . . severe renal failure requiring dialysis. . . . If you said to me, 'which one of those did it,' the answer is all of them . . . . [I]t's not just your hypertension that contributes, it's not just your hyperlipidemia that contributes, it's not just your diabetes, it's not just your vascular disease, it is all of those together."

      Although the Court found both experts to be qualified, persuasive in many respects, and credible, it was most persuaded by Dr. Fischione's opinion that the trauma caused by the leg fracture on August 31, 2017 exacerbated Stevens's existing co-morbidities, which in turn contributed to Stevens's death on September 9, 2017. The temporal proximity between the accident and death powerfully supports this conclusion. As for Dr. Hendin's competing explanation—essentially, that Stevens was destined to succumb to her co-morbidities on September 9, 2017, regardless of the accident—the Court found it relatively unpersuasive, particularly because Stevens was able to survive despite those co-morbidities for many years and began experiencing new symptoms in the immediate aftermath of the

1  accident (*i.e.*, seizures) that she had never previously experienced.

2  VIII.  Damages

3  At trial, all seven of Stevens's surviving children testified. Based on this testimony, the Court has little trouble concluding that Stevens was the beloved matriarch of a close-knit family and had strong relationships with all seven of her children at the time of her death. In a related vein, the Court finds that all seven children suffered damages from the premature demise of their mother. These damages consist of the loss of Stevens's love, affection, companionship, care, protection, and guidance, as well as pain, grief, sorrow, anguish, stress, shock, and mental suffering.

With that said, the Court also finds that, although the accident caused Stevens to die earlier than she otherwise would have died, it is highly unlikely that she would have had much time left but-for the accident. Stevens had already been undergoing dialysis for 12 years at the time of the accident and was beset by many other serious health conditions that posed a significant risk of death. Indeed, it is the presence of those conditions that makes the causation analysis so complicated in this case. In the Court's view, it is necessary and appropriate to take this factor into consideration when considering the damages that each of Stevens's children sustained as a result of her death. Although the premature loss of a beloved mother is always a significant event that causes real, tangible damage, the degree of damage depends on the circumstances. Here, where the case involves middle-aged adults (many of whom have children and grandchildren of their own) who likely would have had little time left with their mother even if the accident hadn't occurred, the damages must be tempered in relation to a different case with different facts.

Given this backdrop, although the Court rejects as insufficient the defense's suggestion that the overall amount of damages sustained by all seven children is $50,000, the Court also disagrees with Plaintiff's suggestion that each child should receive $75,000 in damages. Acknowledging the profound difficulty in attempting to quantify the loss of one's mother, the Court concludes that each child sustained $25,000 in damages.

…

- 11 -

**CONCLUSIONS OF LAW**

The parties agree (Doc. 50 at 4; Doc. 51 at 4) that Plaintiff's FTCA claim is controlled by Arizona's law of negligence, which in turn requires Plaintiff to prove the following four elements: "(1) a legal duty of the defendant to conform to a standard of conduct recognized by Arizona law for the protection of others against unreasonable risks; (2) the failure of the defendant to conform to the required standard; (3) a reasonably close causal connection between the defendant's conduct and the resulting injury to plaintiff (proximate cause); and (4) actual loss by or damage to the plaintiff." *Ontiveros v. Borak*, 667 P.2d 200, 204 (Ariz. 1983).

As for the first and second elements (duty and breach), to the extent they are even disputed—defense counsel acknowledged before closing argument that "it is true we have not presented any facts in opposition to the allegation of breach of standards of care"—Plaintiff has met her burden of establishing them. Parker had a duty to fasten Stevens's shoulder belt before driving off (as established by the testimony of Plaintiff's expert West), as well as a duty to use reasonable care when driving, and breached those duties by failing to secure Stevens's shoulder belt and then braking hard at the yellow light.

As for the third element (proximate cause), the defense correctly notes (Doc. 51 at 5) that a mere possibility of causation is insufficient and that a "plaintiff proves proximate cause . . . by demonstrating a natural and continuous sequence of events stemming from the defendant's act or omission, unbroken by any efficient intervening cause that produces an injury, in whole or in part, and without which the injury would not have occurred." *Barrett v. Harris*, 86 P.3d 954, 958 (Ariz. App. 2004). Nevertheless, this standard is satisfied here for the reasons stated in the Findings of Fact—Dr. Fischione's testimony, as well as the sheer temporal proximity between the accident and death, are sufficient to establish that Parker's breaches of the standard of care were the proximate cause of Stevens's death. After all, "Defendant's act need not have been a 'large' or 'abundant' cause of the final result; there is liability if the result would not have occurred but for defendant's conduct, even if that conduct contributed 'only a little' to plaintiff's injuries."

*Ontiveros*, 667 P.2d at 205 (citation omitted).

As for the fourth element (damages), the defense acknowledges that each surviving child "may recover damages for loss of companionship, comfort, and guidance from [Stevens] at the time of her death." (Doc. 51 at 6.) Although Plaintiff phrases the test slightly differently—she contends that each child may recover for "the loss of love, affection, companionship, care, protection, and guidance since the death of [Stevens] and in the future," as well as for "the pain, grief, sorrow, anguish, stress, shock, and mental suffering already experienced and reasonably probable to be experienced in the future" (Doc. 50 at 9)—the Court discerns no meaningful difference between these two standards and clarifies that the award of $25,000 in damages to each child would be the same regardless of which standard were used.[4]

Finally, the defense has asserted an affirmative defense of contributory negligence based on the fact that "Stevens chose to repeatedly reject a seat belt while be[ing] transported to dialysis." (Doc. 51 at 7.)[5] Under Arizona law, "[t]he test for contributory negligence is whether the conduct under the circumstances was that of a reasonable, prudent person exercising ordinary care for his own safety." *McGriff v. McGriff*, 560 P.2d 1230, 1233 (1977). If Stevens was contributorily negligent, "the full damages shall be reduced in proportion to the relative degree of [her] fault which is a proximate cause of the injury or death." A.R.S. § 12-2505(A).

Here, Stevens bears 25% of the fault in light of the fact that Parker failed to secure the shoulder belt at her request. None of the other passengers in the van suffered injury from the braking incident, which suggests that if Stevens had simply allowed Parker to belt her into place (as had been his practice until she instructed him to stop), she would have

---

[4] Although Plaintiff also notes the possibility of recovering damages related to funeral expenses (Doc. 50 at 9), Plaintiff did not request any such damages during closing argument. Additionally, the evidence at trial was that tribal authorities and friends paid all of the relevant expenses.

[5] Plaintiff's suggestion during closing argument that this defense was not disclosed in the joint final pretrial order is mistaken—the defense is clearly and properly disclosed. (Doc. 54 at 6 ["Defendant contends that Veronica Stevens was negligent and at fault for the accident because she did not want to wear the shoulder belt."].)

avoided injury, too. It is appropriate to assign some fault to Stevens under these circumstances. *See generally Law v. Superior Court*, 755 P.2d 1135, 1143 (Ariz. 1988) ("We reject those cases . . . that rely on the absence of 'duty' to reject the seat belt defense. . . . At least under the comparative fault statute, each person is under an obligation to act reasonably to minimize foreseeable injuries and damages. Thus, if a person chooses not to use an available, simple safety device, that person may be at 'fault.'").

After the 25% reduction, each child is awarded $18,750 in damages. The overall award is $131,250.

\*\*\*

Accordingly, **IT IS ORDERED** awarding damages in favor of Plaintiff and against Defendant United States of America in the following amounts: Clementine Thomas: $18,750; Aaron B. Kaytoggy: $18,750; Carmalinda Lavender: $18,750; Mitzi Classay: $18,750; Trevino DePaul Stevens: $18,750; Cindy Kaytoggy: $18,750; Lamonica Ann Taylor: $18,750.

**IT IS FURTHER ORDERED** that any conclusion of law deemed a finding of fact is so adopted.

**IT IS FURTHER ORDERED** that a separate judgment shall issue, after which the Clerk shall terminate this action.

Dated this 16th day of September, 2022.

_____
Dominic W. Lanza
United States District Judge